IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

AUGUSTA DIVISION

```
DONNA ADAMS-PICKETT, MD, and      *
AUGUSTA WOMEN'S HEALTH &          *
WELLNESS CENTER, P.C.,            *
                                  *
            Plaintiffs,           *
                                  *
      v.                          *          CV 122-063
                                  *
MAG MUTUAL INSURANCE COMPANY,     *
                                  *
            Defendant.            *
```

_____

**O R D E R**

_____

For the following reasons, the Court **GRANTS** summary judgment in favor of Defendant Mag Mutual Insurance Company ("MagMutual") on Plaintiffs' racial discrimination claim under 42 U.S.C. § 1981 and **DISMISSES WITHOUT PREJUDICE** the state law claims.  (Id.)

## I.   BACKGROUND

This case arises out of a professional liability insurance policy issued by MagMutual to Plaintiffs Donna Adams-Pickett, MD, and Augusta Women's Health & Wellness Center, P.C.  (See doc. 1, "Compl.".)  The Complaint, filed on May 17, 2022, alleges MagMutual cancelled and refused to reinstate coverage because of Dr. Adams-Pickett's race in violation of 42 U.S.C. § 1981, wrongfully cancelled the policy in violation of O.C.G.A. § 33-24-44, and breached the Georgia covenant of good faith and fair dealing.  (Id.

at 4-7.)

## A. Factual Background

Dr. Adams-Pickett is an African American female Obstetrician/Gynecologist who opened her solo practice in 2008. (Doc. 64-1, "D SMF," ¶ 6; Compl., pp. 1-2.)  Dr. Adams-Pickett owns and operates Augusta Women's Health & Wellness Center, P.C., and her husband, Elmer Pickett, serves as Chief Financial Officer and business manager.  (Compl., p. 2; D SMF ¶ 6.)

MagMutual first issued claims-made medical malpractice insurance to Plaintiffs in October 2008, and renewed coverage for fourteen years through issuance of the final policy covering October 2021 to October 2022.  (D SMF ¶¶ 2, 4; doc. 87, "P SMF," ¶ 1.)  From 2015 to 2021, five of Dr. Adams-Pickett's patients filed malpractice suits against her, with three alleging shoulder dystocia, a fourth alleging hypoxic ischemic encephalopathy, and a fifth alleging bilaterial parenchymal frontal and temporal bleeds.  (D SMF ¶¶ 9-13.)  By the time MagMutual cancelled coverage for nonpayment and declined Plaintiffs' request for reinstatement, four of these five lawsuits remained pending, MagMutual had settled the fifth lawsuit, and Plaintiffs' total "incurred losses," as MagMutual uses this term, was $█████, which includes defense payments made on open claims, defense and indemnity payments made on closed claims, and reserves for projected future defense and indemnity payments on open claims.  (D SMF ¶¶ 41-42 (citing doc.

64-4, "Willis Decl.," ¶ 6).)   Plaintiffs' incurred losses of $███████ included a total reserve for the four pending lawsuits of $██████.   (D SMF ¶¶ 41 (citing Willis Decl. ¶ 6); <u>see also</u> doc. 87-7, "Lewis Dep.," pp. 65-69; doc. 64-5, "Coffin Dep.," pp. 84, 86.)   MagMutual uses the term "loss history" more broadly to include not only incurred losses, but also other details such as the number, status, type, and strength of covered claims.   (<u>See</u> Willis Decl. ¶ 6.)

To understand how Plaintiffs fell behind on premium payments, one must look back to 2020 when, to alleviate financial hardships caused by the COVID-19 pandemic, MagMutual created a Premium Deferral Program ("PDP").   (D SMF ¶ 15.)   Plaintiffs enrolled their 2020-2021 policy in the PDP in September 2020.   (D SMF ¶ 16; P SMF ¶¶ 8, 10.)   MagMutual explained the PDP terms in a notice issued to all enrollees, stating in relevant part as follows:

> Our records indicate that you elected to participate in our 2020 premium deferral program, and we wanted to provide you with some important information:
> - You will receive separate invoices for your deferred premium balance and your current policy premium balance.
> - The invoices for your deferred premium will have a unique account number ending in – EXT.
> - Payments will first be applied to any currently due premium balances that were previously deferred under the program.   For example, if you have both a currently due deferred premium of $500 and a current premium of $500 due on March 1 and remit only one payment of $500, your payment will be applied to the deferred premium balance.   You will still need to remit the additional $500 to keep your current policy in good standing.

(D SMF ¶ 19; P SMF ¶ 12.)  MagMutual contends it sent this notice to Plaintiffs by mail, but Plaintiffs do not recall receipt.  (D SMF ¶ 19; P SMF ¶ 12.)

One year after Plaintiffs' PDP enrollment, on September 21, 2021, MagMutual Senior Account Manager Kimberly McGee Coffin emailed Dr. Adams-Pickett, informing her of the premium payment schedule for both Plaintiffs' automatically renewed 2021-2022 policy and the deferred premium for the 2020-2021 policy.  (D SMF ¶ 23; P SMF ¶ 14.)  Due dates for both were October 1, 2021; January 1, 2022; and April 1, 2022.  (D SMF ¶ 23.)  In addition, the email included a July 1, 2022, due date for a fourth payment on the renewed policy.  (Id.)  It is undisputed Plaintiffs received this email because Dr. Adams-Pickett followed up with a reply email more than three months later, on January 3, 2022, requesting enrollment in another COVID assistance program.  (Id. ¶ 28.)

Plaintiffs timely made the payments due on October 1, 2021, for both the renewed policy and deferred premium.  (Id. ¶ 27.)  On December 2, 2021, MagMutual mailed separate invoices for the January 1, 2022, premiums due on both policies.  (Id.)  The amounts due were $███████ for the renewed policy and $███████ for the deferred premium.  (Id. ¶ 23.)  Plaintiffs contend they did not receive the invoice for the deferred premium.  (Id. ¶ 30.)  Plaintiffs failed to pay both premiums.  (See id. ¶ 29.)  Thus,

MagMutual automatically issued a Notice of Intent to Cancel ("Notice") dated January 17, 2022. (D SMF ¶ 29; P SMF 16.) The Notice warned Plaintiffs that, to avoid cancellation of coverage, they must pay the overdue premium on the renewed policy of $███████ by February 6, 2022. (P SMF ¶¶ 16, 18.) The Notice did not mention the overdue deferred premium of $███████. (P SMF ¶¶ 16, 18.)

On January 28, 2022, Mr. Pickett called MagMutual to inquire about the minimum balance due to avoid cancellation of the policy. (D SMF ¶ 31; P SMF ¶ 17.) A MagMutual accounting employee informed Mr. Pickett that, to avoid cancellation of the renewed policy, he would need to pay $█████, the overdue amount on the renewed policy as referenced in the January 17th Notice. (D SMF ¶ 31; P SMF ¶¶ 16-17.) Mr. Pickett did not inquire about payments due for the deferred premium, nor did the accounting employee offer any information about deferred premiums in general or the unpaid deferred premium of $███████ due on January 1, 2022. (See D SMF ¶ 31; P SMF ¶ 17.) Mr. Pickett paid $█████, and consistent with the accounting employee's advice, MagMutual initially credited the payment to the renewed policy as the receipt issued by MagMutual confirmed. (D SMF ¶ 31; P SMF ¶¶ 16-17.)

After the January 28th phone call and payment, however, MagMutual ran a receivables report that listed as unpaid the deferred premium due January 1, 2022. (D SMF ¶ 33.) Pursuant to

the PDP conditions, MagMutual accounting personnel manually transferred the entire January 28th payment from the renewed policy to the deferred premium. (D SMF ¶ 31; P SMF ¶ 20; see also D SMF ¶ 19 ("Payments will first be applied to any currently due premium balances that were previously deferred under the program.").) As a result of this transfer, MagMutual's records reflected nonpayment of the January 1, 2022, premium due on the renewed policy. (D SMF ¶ 34; see also P SMF ¶ 20.) MagMutual did not notify Plaintiffs of the payment transfer or its consequences. (P SMF ¶ 26; see also D SMF ¶¶ 33-34.)

Because the premium balance transfer resulted in an overdue balance on the renewed policy, MagMutual automatically cancelled the renewed policy and issued a Cancellation Endorsement to Plaintiffs on or around February 6, 2022. (D SMF ¶ 34; P SMF ¶ 24.) Both the policy cancellation and related issuance of the Cancellation Endorsement occurred automatically with no involvement of MagMutual personnel. (D SMF ¶ 34.)

When MagMutual cancels a policy, the underwriting department must approve any reinstatement. (D SMF ¶ 35; P SMF ¶ 17.) On February 7, 2022, Jeremy Leal, the MagMutual Claims Analyst overseeing the open lawsuits against Plaintiffs, emailed Xavier Lewis, Senior Underwriter, informing him of the status of the four pending lawsuits against Plaintiffs. (D SMF ¶ 36; P SMF ¶ 31.) Mr. Leal's email was unprompted and unrelated to cancellation of

the policy the day prior.  (See D SMF ¶ 36; see also P SMF ¶ 32.) Mr. Leal does not have access to information concerning the status of policies and stated in his email he was "not sure if [Dr. Adams-Pickett] is still insured with us or not."  (See D SMF ¶¶ 36, 38; P SMF ¶¶ 31-32.)  That same day, Mr. Lewis reviewed Plaintiffs' policy status and forwarded Mr. Leal's email to Austin Marshall and Debbie Willis, other underwriting department personnel, noting Plaintiffs' policy was "just cancelled for non-payment" and suggesting they "think about whether we want to reinstate."  (D SMF ¶¶ 39, 41; P SMF ¶ 31.)

On that same date, after reviewing Plaintiffs' policy status, loss history, and open claims, Ms. Willis decided MagMutual would deny any request for reinstatement of Plaintiffs' policy and emailed Ms. Coffin to inform her of this decision.  (D SMF ¶¶ 42, 44; P SMF ¶ 31.)  Ms. Willis, also an African American female, was unaware of Dr. Adams-Pickett's race at the time she made this decision.  (D SMF ¶ 43; Willis Decl. ¶ 1.)  Furthermore, MagMutual's insurance applications do not request information concerning race, and the underwriting department neither solicits nor obtains such information.  (D SMF ¶¶ 3, 40.)  Ms. Willis declared she "would have made the same decision not to reinstate Dr. Adams-Pickett's cancelled 2021-2022 insurance policy even if she was a different race and not African-American." (Willis Decl. ¶ 8.)

The next day, Ms. Coffin emailed Dr. Adams-Pickett to explain MagMutual cancelled the renewed policy for nonpayment and made a final decision to not reinstate coverage because of Plaintiffs' loss history.  (D SMF ¶¶ 44, 46; P SMF ¶¶ 27, 39, 43.)  Dr. Adams-Pickett requested reconsideration, arguing (1) she never received an invoice for the January 1, 2022, payment on the deferred account; (2) MagMutual failed to inform her of the premium balance transfer prior to cancellation; and (3) had she been aware of the transfer, she would have made another payment to avoid cancellation.   (P  SMF  ¶  27.)   MagMutual  rejected  the reconsideration request.  (D SMF ¶ 47; P SMF ¶ 27.)

With Ms. Coffin's assistance, Plaintiffs obtained replacement coverage through a partner broker of MagMutual.  (D SMF ¶¶ 47-48, 50-51; P SMF ¶¶ 65-66.)  Dr. Adams-Pickett submitted applications to seven insurers, only three of which offered coverage in light of Plaintiffs' claims and loss history.  (D SMF ¶¶ 48, 50-51, 54.) MagMutual continued to defend and indemnify Plaintiffs in the malpractice lawsuits filed during MagMutual coverage.  (D SMF ¶ 60.)

## II.  LEGAL STANDARD

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Facts are "material" if they could "affect the outcome of the suit under the

governing [substantive] law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The Court must view the facts in the light most favorable to the non-moving party, Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and must draw "all justifiable inferences in [its] favor." United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1437 (11th Cir. 1991) (*en banc*) (citation omitted and internal quotation marks omitted).

The moving party has the initial burden of showing the Court, by reference to materials on file, the basis for the motion. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). How to carry this burden depends on who bears the burden of proof at trial. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). When the non-movant has the burden of proof at trial, the movant may carry the initial burden in one of two ways – by negating an essential element of the non-movant's case, or by showing that there is no evidence to prove a fact necessary to the non-movant's case. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 606-08 (11th Cir. 1991) (explaining Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970), and Celotex, 477 U.S. 317). Before the Court can evaluate the non-movant's response in opposition, it must first consider whether the movant has met its initial burden of showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. Jones v. City of Columbus, 120 F.3d

248, 254 (11th Cir. 1997) (*per curiam*).  A mere conclusory statement that the non-movant cannot meet its burden at trial is insufficient.  <u>Clark</u>, 929 F.2d at 608.

If — and only if — the movant carries its initial burden, the non-movant may avoid summary judgment only by "demonstrat[ing] that there is indeed a material issue of fact that precludes summary judgment."  <u>Id.</u>  When the non-movant bears the burden of proof at trial, the non-movant must tailor its response to the method by which the movant carried its initial burden.  <u>Id.</u>  If the movant presents evidence affirmatively negating a material fact, the non-movant "must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated."  <u>Fitzpatrick</u>, 2 F.3d at 1116.  If the movant shows an absence of evidence on a material fact, the non-movant must either show that the record contains evidence that was "overlooked or ignored" by the movant or "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency."  <u>Id.</u> at 1116-17.  The non-movant cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint.  <u>See</u> <u>Morris v. Ross</u>, 663 F.2d 1032, 1033-34 (11th Cir. 1981).  Rather, the non-movant must respond with affidavits or as otherwise provided by Federal Rule of Civil Procedure 56.  Federal Rule of Civil Procedure 56 requires a party disputing a

fact to cite "to particular parts of materials in the record," and an affidavit or declaration used to oppose a summary judgment motion "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(1) & (4).

Here, MagMutual argues summary judgment on the § 1981 claim is proper for the following reasons: (1) reinstatement of a cancelled policy is not a protected right under § 1981; (2) there can be no discriminatory intent since cancellation occurred automatically due to nonpayment, MagMutual does not keep records concerning the race of its policyholders, and Ms. Willis denied reinstatement without knowing Dr. Adams-Pickett's race; and (3) MagMutual cancelled coverage because Plaintiffs fell behind on premium payments, and refused to reinstate coverage because Plaintiffs' loss history was extraordinary.  (See doc. 64.)  As explained below, no reasonable juror could find intentional race discrimination in violation of § 1981 because the undisputed evidence shows no discriminatory intent and, instead, demonstrates compelling, legitimate, and nondiscriminatory reasons for MagMutual to cancel coverage and deny reinstatement.

### III. DISCUSSION

**A.   MagMutual Is Entitled to Summary Judgment on Plaintiffs'
       § 1981 Racial Discrimination Claim**

Plaintiffs have identified no direct evidence of discrimination.  In a § 1981 case based on circumstantial evidence, the burden-shifting test derived from McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), applies.  Under that test, a plaintiff must first establish a *prima facie* case of discrimination, which "creates a rebuttable presumption that the [defendant] unlawfully discriminated against her."  Brooks v. Cnty. Comm'n, 446 F.3d 1160, 1162 (11th Cir. 2006) (citation omitted) (internal quotation marks omitted).  If the plaintiff demonstrates a *prima facie* case, the burden shifts to the defendant to offer legitimate, non-discriminatory reasons for its actions.  Id.  If the defendant offers legitimate, nondiscriminatory reasons, the burden shifts back to the plaintiff to rebut those reasons and show they are merely pretext for discrimination.  Id.  "Although the intermediate burdens of production shift back and forth, the ultimate burden of persuading the trier of fact that the [defendant] intentionally discriminated against the [plaintiff] remains at all times with the plaintiff."  Id.  (citation omitted) (internal quotation marks omitted).

In a non-employment § 1981 case, the *prima facie* case requires a plaintiff to show:  "(1) that she is a member of a protected

class; (2) that the allegedly discriminatory conduct concerned one or more of the activities enumerated in the statute; . . . and (3) that the defendants treated plaintiff less favorably with regard to the allegedly discriminatory act than the defendants treated other similarly situated persons who were outside plaintiff's protected class." Benton v. Cousins Props., Inc., 230 F. Supp. 2d 1351, 1370 (N.D. Ga. 2002). "[T]he third prong requires plaintiff to show an apt comparator of a different race who was not subjected to the same harsh treatment with regard to the enforcement of a contract as was the plaintiff." Id.

1. **Plaintiffs Fail to Establish a *Prima Facie* Case of Racial Discrimination Because There Is No Evidence of More Favorable Treatment to Comparator Policyholders**

It is undisputed the first prong of the *prima facie* case is satisfied because Dr. Adams-Pickett is African American. Although MagMutual contests the second prong, the Court will assume for the sake of argument it is also satisfied. Where Plaintiffs fail completely is the third prong because they have failed to show MagMutual treated them less favorably in policy cancellations and non-reinstatement than other similarly situated persons outside the protected class.

From the start, common sense dictates there is little chance of racial discrimination where, as here, MagMutual has presented undisputed evidence (1) it does not maintain any information regarding the race of its policyholders; (2) computer processes

automatically cancel coverage due to nonpayment; and (3) Ms. Willis, the MagMutual Senior Underwriter who denied Plaintiffs' request for reinstatement after cancellation, is an African American female herself who had no way of determining Dr. Adams-Pickett's race and no personal knowledge she was African American. See Reynolds v. Glynn Cnty. Bd. of Educ., 968 F. Supp. 696, 705 (S.D. Ga. 1996) ("[T]he Board members' lack of knowledge of Cooper's race precludes a reasonable juror from finding that the Board applied a [discriminatory] policy."), aff'd, 119 F.3d 11 (11th Cir. 1997); see also Clay v. Steak & Shake, Inc., No. 120-CV-03195, 2022 WL 1699499, at *10 (N.D. Ga. Jan. 24, 2022), adopted sub nom. Clay v. Steak n Shake, Inc., 2022 WL 1691183 (N.D. Ga. Mar. 2, 2022) ("[T]he ultimate decisionmaker[] was the same race as Plaintiff, which undercuts any argument that race was the but-for cause of his termination."); cf. Brungart v. BellSouth Telecomms., Inc., 231 F.3d 791, 799 (11th Cir. 2000) ("A decision maker cannot have been motivated to retaliate by something unknown to him.").

Laboring hard against these seemingly insurmountable headwinds, Plaintiffs served discovery requests seeking information from MagMutual concerning treatment of other policyholders who enrolled in the PDP, suffered cancellation due to nonpayment, and/or requested reinstatement after cancellation. Because MagMutual does not track the race of its policyholders,

the spreadsheets it produced in response cannot, on their face, be used to determine whether MagMutual treated African American policyholders more or less favorably than policyholders of different races. MagMutual mistakenly provided the full names of its policyholders in earlier versions of the spreadsheets but clawed them back due to privacy concerns and substituted them with spreadsheets redacting policyholder names. Prior to the claw back, Dr. Adams-Pickett "researched some of these policy owners on the internet and easily found [race] information available to me through websites, Facebook, LinkedIn, and similar domains." (Doc. 90-1, "Dr. Adams-Pickett Aff.," ¶ 6.)

Dr. Adams-Pickett discerned from her own review of the spreadsheets and internet research that, for ten policyholders who are not African American, MagMutual applied premium payments to the current, renewed policy despite an outstanding balance on the "deferred accounts[] to keep those policies current/active." (Doc. 86, p. 7 (citing Dr. Adams-Pickett Aff. ¶¶ 53(a)-(h), (t), (w)).) In contrast, MagMutual followed the PDP terms for Plaintiffs' account by transferring the premium payment to the deferred premium account. There are at least three reasons why Dr. Adams-Pickett's gleaning of this information from the spreadsheets and internet is woefully inadequate to carry Plaintiffs' burden of proffering admissible evidence of less favorable treatment.

First, an affidavit offered in opposition to summary judgment must be made on personal knowledge.  Fed. R. Civ. P. 56(c).  Dr. Adams-Pickett concedes she has no personal knowledge of the purported comparators' race.  Instead, she searched "websites, Facebook, LinkedIn, and similar domains" to determine the alleged comparators were white, Indian, and Asian.  (Dr. Adams-Pickett Aff. ¶ 6.)  Plaintiffs concede Dr. Adams-Pickett merely "researched the visual appearance(s)" online of people matching the names of the policyholders.  (Doc. 95, p. 3.)  Dr. Adams-Pickett thus assumed the photos were accurate depictions of the policyholders and made assumptions about their race based solely on these images. (Id.)

Such a speculative effort underscores the purpose and importance of Rule 56, which requires "the requisite personal knowledge must concern facts as opposed to conclusions, assumptions, or surmise."  Perez v. Volvo Car Corp., 247 F.3d 303, 316 (1st Cir. 2001); see also Levinson v. Landsafe Appraisal Servs., Inc., 558 F. App'x 942, 946 (11th Cir. 2014) ("[The] affidavit rests on unsupported speculation that, standing alone, is insufficient to raise a genuine issue of material fact."); Ellis v. England, 432 F.3d 1321, 1327 (11th Cir. 2005) (per curiam) ("[A]ffidavits based, in part, upon information and belief, rather than personal knowledge, are insufficient to withstand a motion for summary judgment.").  Accordingly, Dr. Adams-Pickett's

affidavit is insufficient to establish as fact the race of any of the purported comparators.

Second, Dr. Adams-Pickett's guess as to the race of these policyholders based on unauthenticated information she found on the internet is obviously inadmissible hearsay. See Fed. R. Evid. 801(c); see also Geter v. Schneider Nat'l Carriers, Inc., No. 1:20-CV-1148-SCJ, 2022 WL 1231706, at *4 (N.D. Ga. Mar. 21, 2022) (excluding affiant's conclusions drawn from calendar not submitted with affidavit), aff'd, No. 22-11285, 2023 WL 7321610 (11th Cir. Nov. 7, 2023). "Although a hearsay statement can be considered at summary judgment if it can be reduced to admissible evidence at trial, the 'possibility that unknown witnesses will emerge to provide testimony . . . is insufficient to establish that the hearsay statement could be reduced to admissible evidence at trial.'" Carrizosa v. Chiquita Brands Int'l, Inc., 47 F.4th 1278, 1303 (11th Cir. 2022) (quoting Jones v. UPS Ground Freight, 683 F.3d 1283, 1294 (11th Cir. 2012)). Because Plaintiffs have failed to explain how they might reduce the hearsay to admissible evidence at trial, and no solution is obvious or even likely based on the limited information provided by Plaintiffs, it cannot be considered at summary judgment.

Third, even if the Court were to accept Dr. Adams-Pickett's assumptions about race, Plaintiffs still fail to identify "comparators of a different race who were 'similarly situated in

all material respects' and were not subject to the same mistreatment." Ziyadat v. Diamondrock Hosp. Co., 3 F.4th 1291, 1296 (11th Cir. 2021) (quoting Lewis v. City of Union City, Ga., 918 F.3d 1213, 1220 n.5 (11th Cir. 2019) (en banc)). With respect to cancellation, many of the alleged comparators suffered the same automatic cancellation for nonpayment as Dr. Adams-Pickett, (see Dr. Adams-Pickett Aff. ¶ 6), some only enrolled in the PDP after cancellation and during reinstatement, (see id. ¶¶ 6(b)-(c), (e)-(g)), and others never enrolled in the PDP, (see id. ¶¶ 6(i)-(s), (u)-(v)). Accordingly, Plaintiffs' attempts to argue the transfer of the January 28th payment and automatic cancellation of the policy are evidence of less favorable treatment fail because they have not identified policyholders who were similarly situated when MagMutual took these actions. Moreover, Dr. Adams-Pickett conceded she lacked material information concerning other comparators. (See id. ¶¶ 6(h) (conceding insufficient information to compare pre-cancellation account status), (t) (unclear whether policyholder enrolled in PDP), (w) (unable to surmise race).)

Dr. Adams-Pickett cries foul because, as to some of the "white" policyholders she identified through her internet searches, MagMutual granted their requests for reinstatement and was more accommodating to them with respect to partial and late payments. (See id. ¶ 6.) But Plaintiffs present no evidence of the loss histories for these comparators and contend the loss

histories are irrelevant. (See doc. 86; P SMF ¶¶ 53, 55; doc. 95.) It is impossible, however, to find substantial similarity and unequal treatment when (1) the sole and undisputed basis for denying Plaintiffs' request for reinstatement is her loss history; and (2) Plaintiffs have utterly failed to provide any information concerning the loss histories of the alleged comparators. There is simply nothing to compare.

A plaintiff who fails to present a *prima facie* case of discrimination "may still be able to prove her case with what we have sometimes called a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." Tynes v. Fla. Dep't of Juv. Just., 88 F.4th 939, 946 (11th Cir. 2023) (internal quotation marks and citations omitted). Plaintiffs contend as much here, but there is no evidence in the record to suggest race played any role in the transfer of the January 28th payment, the initial cancellation due to nonpayment, or the denial of Plaintiffs' request for reinstatement. No reasonable juror could find otherwise when construing the entire evidentiary record in the light most favorable to Plaintiffs.

Plaintiffs also allude to a cat's paw theory of liability, merely pointing out at least some MagMutual personnel who had direct dealings with Dr. Adams-Pickett were aware of her race. The theory is inadequately presented and thus waived. McCreight

19

v. Auburn Bank, No. 22-12577, 2024 WL 4232440, at *6 (11th Cir. Sept. 19, 2024) ("We 'rely on the parties to frame the issues' by 'advancing the facts and arguments entitling them to relief.'  So a plaintiff wishing to 'prevail on a particular theory of liability' must 'present that argument to the district court.'" (citations omitted)); see also Sapuppo v. Allstate Floridian Ins. Co., 739 F.3d 678, 681 (11th Cir. 2014).  The claim fails on the merits as well for two reasons.  First, no human made the decision to cancel coverage for nonpayment.  It is undisputed the process occurred automatically upon Plaintiffs' failure to remit payment. Second, the sole decisionmaker who determined MagMutual would not reinstate coverage after cancellation was Ms. Willis, also an African American female, and it is undisputed that she was unaware of Dr. Adams-Pickett's race at the time she made this decision. (D SMF ¶ 43; Willis Decl. ¶ 1); see McCreight, 2024 WL 4232440, at 13 (explaining, in retaliation context, "mere speculation" lower-level personnel "*could* have told" decisionmaker about protected conduct is "too attenuated").

For all of these reasons, Plaintiffs have failed to establish a *prima facie* case of racial discrimination under § 1981.

**2.  Even If Plaintiffs Could Establish a *Prima Facie* Case of Racial Discrimination, Plaintiffs Fail to Demonstrate Pretext**

Denying any discriminatory intent, MagMutual argues it cancelled coverage because Plaintiffs failed to make timely

premium payments, and it denied reinstatement after cancellation because of Plaintiffs' loss history.  In support, MagMutual tenders the following undisputed facts:

> (1)  Plaintiffs missed their deadline of January 1, 2022, to make scheduled payments on the renewed policy and the PDP deferred premium;
>
> (2)  Plaintiffs made a payment of $▐▐▐▐ on January 28, 2022, intending the payment to be applied to the renewed policy, but still failed to pay the deferred premium due on January 1, 2022;
>
> (3)  Pursuant to the plain terms of the PDP, MagMutual transferred the payment from the renewed policy to the overdue deferred premium;
>
> (4)  The transfer caused the premium for the renewed policy to be remain overdue and owed;
>
> (5)  MagMutual automatically cancelled the renewed policy for nonpayment on February 6, 2022;
>
> (6)  MagMutual Senior Underwriter Ms. Willis, an African American female like Dr. Adams-Pickett, denied Plaintiffs' reinstatement request due to Plaintiffs' loss history; and
>
> (7)  Ms. Willis's decision to deny reinstatement is consistent with MagMutual's denial of every single reinstatement request made by policyholders with similar incurred losses during the twelve-year period of 2010 to 2022.

To show pretext, Plaintiffs' evidence "must reveal such weaknesses, implausibilies, inconsistencies, incoherencies or contradictions in [Defendant's] proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." Vessels v. Atlanta Indep. Sch. Sys., 408 F.3d 763, 771 (11th Cir. 2005) (per curiam) (quotation omitted).  And it is

the Court's job to "draw[ ] the lines on what evidence is sufficient to create an issue on pretext." Rojas v. Florida, 285 F.3d 1339, 1344 (11th Cir. 2002).

In an attempt to show pretext with respect to the transfer of the January 28th payment and initial cancellation, Plaintiffs again rely on the same contentions regarding purported comparators Dr. Adams-Pickett found using the clawed back spreadsheets and unspecified internet information. The Court rejects these arguments for the same reasons stated in section III(A)(1), *supra*.

With respect to Ms. Willis's decision to deny reinstatement after cancellation due to the severity of Plaintiffs' loss history, Plaintiffs claim (1) their loss history was not unusual for an obstetrician/gynecologist; (2) MagMutual renewed their coverage previously with substantially the same loss history, (doc. 86, p. 19); (3) MagMutual set the reserves too high on the open lawsuits, citing in support MagMutual's alleged characterization of these lawsuits as "strongly defensible"; and (4) Dr. Adams-Pickett's white colleagues at Doctors Hospital easily maintained their malpractice coverage despite comparable or more severe loss histories and claims, (P SMF ¶ 55). These arguments fail to establish pretext for the following reasons.

First, every MagMutual employee who offered an opinion on the subject confirmed Plaintiffs' loss history was not only severe but also extraordinary to the point of being nearly unprecedented.

Plaintiffs offer no evidence to suggest otherwise. Indeed, it is undisputed that, of all MagMutual medical malpractice policyholders from 2010 to 2022, only seven had loss histories comparable to Plaintiffs', and MagMutual canceled coverage for all seven. (Doc. 64-6, p. 12; D SMF ¶ 65.) Ms. Willis testified by declaration that Plaintiffs' loss history "was unacceptably high" and four open lawsuits for a solo practitioner was "highly unusual." (Willis Decl., ¶ 6.) Ms. Coffin testified at her deposition, "I had not ever seen a loss history that severe." (Coffin Dep., p. 96.) Mr. Wienges described Dr. Adams-Pickett's loss history as "very prolific." (Doc. 64-11, p. 13.) While Mr. Lewis did testify, as Plaintiffs point out, that ██ claims over ten years would not be "unusual," (Lewis Dep., p. 71), this statement was generalized. When presented specifically with Plaintiffs' claims history, Mr. Lewis stated Plaintiffs' ██ open claims were "not routine." (Lewis Dep., p. 81.)

Second, Plaintiffs correctly point out MagMutual renewed coverage without any question as recently as October 2021, just four months before cancellation and denial of reinstatement. MagMutual counters, however, by explaining it automatically renewed coverage with no underwriting involvement, and established procedures require approval by underwriting prior to reinstatement of a cancelled policy. (Doc. 64, p. 5; D SMF ¶ 21.) After reviewing Plaintiffs' policy status, loss history, and open

claims, Ms. Willis denied Plaintiffs' request for reinstatement. (D SMF ¶¶ 42, 44; P SMF ¶ 31.) Accordingly, Plaintiffs' reliance on the unpublished case <u>Lewis v. Sch. Bd. of Palm Beach Cnty., Fla.</u>, 850 F. App'x 674 (11th Cir. 2021) (*per curiam*), is inapposite. There, an employee received a positive performance review shortly before being terminated from his position, which was inconsistent with the non-discriminatory reasons later presented for the termination. <u>See id.</u> at 680. But a positive performance review personally issued by the decisionmaker who later takes adverse action is incomparable to an automatic policy renewal requiring no involvement of MagMutual personnel, followed by a decision not to reinstate coverage due to an indisputably atrocious loss history. Thus, Plaintiffs' prior, automatic renewals of their policy do not demonstrate pretext.

Third, regardless of whether MagMutual characterized the four open lawsuits as highly defensible, Plaintiffs have submitted no evidence or expert opinion to suggest MagMutual set the reserve amounts too high. The Court will not, and indeed cannot, second-guess a business judgment, especially where there is no basis for determining the reserves were incorrect or intentionally set too high due to racial animus. <u>See</u> <u>Rojas</u>, 285 F.3d at 1344.

Fourth, Dr. Adams-Pickett testified that, as department chair at Doctors Hospital, she reviewed loss histories of colleagues who never experienced problems renewing coverage and "her own loss

history was comparable or contained substantially fewer number of claims/cases." (P SMF ¶ 55.) Much like her internet research for comparators, however, Dr. Adams-Pickett fails to identify her colleagues and relies on unspecified information concerning their loss histories that is unauthenticated and inadmissible hearsay. Furthermore, as Dr. Adams-Pickett admitted during her deposition, not all of her colleagues were insured by MagMutual or practiced the same medical specialty. (See Dr. Adams-Pickett Dep., pp. 206-07.) "Inferences based upon speculation are not reasonable." Lewis, 850 F. App'x at 679 (citing Kernel Records Oy v. Mosley, 694 F.3d 1294, 1301 (11th Cir. 2012)).

The evidence Plaintiffs present – to the extent it is admissible and competent for summary judgment purposes - simply does not reveal "weaknesses, implausibilities, inconsistencies, incoherencies or contradictions" in Defendant's legitimate business reasons such that a jury could find them "unworthy of credence." Vessels, 408 F.3d at 771; see also McCreight, 2024 WL 4232440, at *7.

Because Plaintiffs have failed to present evidence from which a reasonable juror could infer intentional discrimination, their § 1981 claim fails as a matter of law and MagMutual's motion is **GRANTED** as to this claim.

Before turning to the state law claims, the Court would be remiss if it failed to acknowledge the obvious inadequacies in

MagMutual's treatment of Plaintiffs during the critical period of January and February 2022.  MagMutual instructed Mr. Pickett that Plaintiffs must only pay the overdue premium on the renewed policy to maintain coverage, never mentioned a need to pay the deferred premium, and did not explain payment would be transferred to the deferred premium and leave the renewed policy past due and subject to cancellation.  When Mr. Pickett made the payment as instructed, MagMutual did not notify Plaintiffs of the premium payment transfer or issue a second notice of cancellation, but instead cancelled coverage without further warning or explanation.  However, mistreatment of a policyholder is not tantamount to racial discrimination.  That "kind of inquiry—whether a business decision is wise or nice or accurate—is precluded by [Eleventh Circuit precedent]." Rojas, 285 F.3d at 1344.  In fact, a defendant may act "for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as it [ ] is not for a discriminatory reason." Brown v. Am. Honda Motor Co., 939 F.2d 946, 951 (11th Cir. 1991) (alteration in original) (citation omitted) (internal quotation marks omitted).

**B.   The Court Declines to Exercise Supplemental Jurisdiction Over Plaintiffs' State Law Claims**

Having granted summary judgment to MagMutual on Plaintiffs' sole federal claim, the Court declines to exercise supplemental jurisdiction over Plaintiffs' state law claims.  See 28 U.S.C.

§ 1367(c) (authorizing district court to decline exercise of supplemental jurisdiction when it has dismissed all claims under which it has original jurisdiction); see also Raney v. Allstate Ins. Co., 370 F.3d 1086, 1089 (11th Cir. 2004) ("We have encouraged district courts to dismiss any remaining state claims when, as here, the federal claims have been dismissed prior to trial.") (citing L.A. Draper & Son v. Wheelabrator-Frye, Inc., 735 F.2d 414, 428 (11th Cir. 1984)).

### IV. CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** that MagMutual's motion for summary judgment, (doc. 50), is **GRANTED** as to Plaintiffs' federal law claim arising under 42 U.S.C. § 1981. The Court declines to exercise supplemental jurisdiction over Plaintiffs' state law claims, and therefore those claims are **DISMISSED WITHOUT PREJUDICE**. The Clerk is directed to enter **JUDGMENT** in favor of MagMutual on the federal law claim, **TERMINATE** all other pending motions, if any, and **CLOSE** this case.

**ORDER ENTERED** at Augusta, Georgia, this 30th day of September, 2024.

HONORABLE J. RANDAL HALL
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA